**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

In re:

**FUNDAMENTAL LONG TERM CARE, INC.**

      **Debtor.**

_____ /

GTCR GOLDER RAUNER, LLC; GTCR FUND
VI, L.P.; GTCR PARTNERS VI, L.P.; GTCR VI
EXECUTIVE FUND, L.P.; GTCR ASSOCIATES
VI; EDGAR D. JANNOTTA, JR.; and THI
HOLDINGS, LLC,

      **Plaintiffs,**

**v.**

BETH ANN SCHARRER, as Chapter 7 trustee;
THE ESTATE OF JUANITA AMELIA JACKSON;
THE ESTATE OF ELVIRA NUNZIATA; THE
ESTATE OF JOSEPH WEBB; THE ESTATE OF
JAMES HENRY JONES; THE ESTATE OF OPAL
LEE SASSER; and THE ESTATE OF ARLENE
ANNE TOWNSEND,

      **Defendants.**

_____ /

**Case No. 8:11-bk-22258 (MGW)**

**Chapter 7**

**Adversary Proceeding No. ____**

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

GTCR Golder Rauner, L.L.C., GTCR Fund VI, L.P., GTCR Partners VI, L.P., GTCR VI

Executive Fund, L.P., GTCR Associates VI (collectively, the "GTCR Entities"), Edgar D.

Jannotta, Jr. ("Jannotta"), and THI Holdings, LLC ("Holdings") allege for their complaint

against the Estate of Juanita Amelia Jackson, the Estate of Elvira Nunziata, the Estate of Joseph

Webb, the Estate of James Henry Jones, the Estate of Opal Lee Sasser, and the Estate of Arlene

Anne Townsend (collectively, the "Wilkes Claimants"), and Beth Ann Scharrer as Chapter 7 trustee (the "Trustee") as follows:

## SUMMARY OF ACTION

1.      This adversary proceeding, brought pursuant to Rules 7001(7), 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 28 U.S.C. § 2201, concerns private equity investors who lost more than $60 million in a failed nursing-home business.

2.      In 1998, a Chicago-based private-equity fund, GTCR Fund VI, L.P. ("Fund VI"), and two affiliated funds, GTCR VI Executive Fund, L.P. ("GTCR Executive Fund") and GTCR Associates VI (collectively, the "GTCR Funds"), invested approximately $1 million in a Maryland-based long-term care business, Trans Healthcare, Inc. ("THI").

3.      In 1999 and again in 2000, the GTCR Funds made additional investments of more than $10 million each year.  And in 2001, the GTCR Funds invested an additional $4 million and loaned $4.5 million more to THI subsidiary.  THI's subsidiaries also borrowed more than $60 million from lending institutions.

4.      Over that period, THI, managed by officers experienced in the healthcare industry, grew rapidly, as its subsidiaries acquired nursing homes.  But the business did not perform as expected.  A restatement of the company's 2003 financial statements showed the company had negative net income.  In July 2004, THI's institutional lenders gave notice that THI and its subsidiaries were in default under the loan documents, and THI and its subsidiaries entered into sixteen successive forbearance agreements with those lenders between 2004 and 2006.

1521287.1

5.      Hoping to reverse THI's financial misfortunes, in early 2006, THI entered into a series of simultaneous transactions that included restructuring the institutional loans and selling its management-company subsidiary, Trans Health Management, Inc. ("THMI"), to the Debtor, Fundamental Long Term Care, Inc. ("FLTCI").  In connection with that restructuring, the GTCR Funds invested another $20 million in THI, through a holding company, THI Holdings, LLC.

6.      THI's business still did not perform, and, in 2007 and 2008, THI and its subsidiaries sold substantially all of their assets to third parties.  The GTCR Funds received no proceeds from those sales.  In January 2009, the failing business filed for receivership in Maryland state court, and THI has been operated, and its assets have been liquidated, by a court-appointed receiver (the "THI Receiver") since then.  Because THI had sold THMI to the Debtor in 2006, THMI was not a party to the receivership proceedings.

7.      Since THI and its subsidiaries were given notice of their default under the loan agreements in July 2004, the GTCR Funds have invested, through Holdings, more than $23 million in THI and have forgiven more than $10 million in loans to THI, and received no payments or transfers from THI or from Holdings.  And, since THI's founding, the GTCR Funds invested, directly or through Holdings, more than $60 million in THI, substantially all of which they lost.

8.      The Maryland receivership court's order establishing the THI receivership in January 2009 stated that all pending litigation against THI was to be stayed.  At the time, the Wilkes Claimants had pending nursing-home negligence lawsuits against THI and THMI and numerous unrelated defendants in Florida and Pennsylvania state courts.

9.     Despite the Maryland receivership order staying litigation against THI, the Wilkes Claimants persuaded state courts in Florida and Pennsylvania to permit their claims against THI and THMI to proceed.

10.     In 2010, the THI Receiver stopped defending THI against the Wilkes Claimants' lawsuits.  THI, which had been defending its former subsidiary, THMI, in those lawsuits, stopped THMI's defense as well.  Thus, most of the Wilkes Claimants obtained defaults against THI and THMI, and some then obtained staggering judgments in empty-chair damages proceedings, ranging from $110 million to $1.1 billion.

11.     The Wilkes Claimants' real strategy in pursuing these substantively baseless judgments against the failed or defunct entities was to sue to collect from numerous entities and individuals that had some previous connection to THMI or THI.  These included, for example, private equity investors (the GTCR Entities), lenders (General Electric Capital Corporation and Ventas Realty, L.P.), law firms (Troutman Sanders, LLP and Concepcion, Sexton & Martinez, P.A.), and counterparties to divestitures (including Fundamental Long Term Care Holdings, LLC).

12.     To that end, in 2011, certain Wilkes Claimants commenced proceedings supplementary in Florida state court to collect alleged assets of THI and THMI purportedly in the hands of third parties.

13.     In *Estate of Jackson v. THMI* (No. 04-3229, Fla. 10th Cir. Ct.), one Wilkes Claimant impleaded three GTCR Entities, Jannotta, and twelve other entities and individuals, to collect on a $110 million judgment against THMI and THI, on theories that the impleaded defendants were involved in fraudulent transfers of THMI and THI's property, were the alter egos of THMI and THI, and had conspired to defraud creditors from recovering THMI and

1521287.1

THI's assets.  One of the core contentions in that lawsuit is that THI's 2006 sale of THMI to the Debtor was purportedly a fraudulent transfer.

14.     In two other state-court lawsuits, *Estate of Nunziata v. THMI* (No. 05-8540, Fla. 6th Cir. Ct.) and *Estate of Webb v. THI* (No. 06-2418, Fla. 8th Cir. Ct.), two Wilkes Claimants adopted a strategy of suing only one target for collection at a time, starting with Rubin Schron, a real-estate investor.  Still, in those cases, the Wilkes Claimants seek to recover the property of THMI and THI, and advance the same theories of fraudulent transfer and conspiracy of the purported "joint venturers" — including the GTCR Entities, Jannotta, and Holdings — to defraud creditors of THMI and THI.

15.     The Trustee in this bankruptcy proceeding has threatened similar claims.  In January 2013, the Trustee represented to the Court that she had already identified the factual components of the "very real claims the Estate holds" against the Wilkes Claimants' litigation targets for "having 'busted out' THMI's assets and operations."  ([Dkt. 16] at ¶ 6.)  Then, in April 4, 2013 correspondence, the Trustee identified the GTCR Entities, Jannotta, and Holdings as potential defendants on avoidable transfer, fraud, aiding and abetting, and alter ego claims. ([Dkt. 771-2], Ex. 2 at 8.)

16.     In an Opinion dated September 12, 2013, this Court addressed the Trustee's expected claims, stating that "[w]here the Trustee is headed with that discovery is really no secret to anyone involved in this case: the Trustee intends on pursuing the 'targets' to recover hundreds of millions of dollars (if not more than a billion dollars) that she believes belongs to the Debtor's chapter 7 estate….  And she has openly stated the means for accomplishing that goal— namely, potential alter ego and fraudulent transfer claims against the 'targets.'"  (Adv. No. 12-ap-01198 MGW, [Dkt. 65] at 5.)

1521287.1

17.    Then, on October 1, 2013, the Wilkes Claimants filed a complaint for declaratory relief against sixteen of their state-court litigation targets, including the GTCR Entities, Jannotta, and Holdings.  In the 562-paragraph complaint, the Wilkes Claimants repeat largely the same allegations they have made in other proceedings concerning purported fraudulent transfers, alter egos, and conspiracies to defraud creditors of THMI and THI, seeking to hold their targets liable for "the debts and liabilities of THI, THMI, and FLTCI," including the default judgments against THI and THMI.  (Wilkes Compl. at 83)

18.    Given that the Trustee has stated that she intends to pursue in this Court theories of fraudulent transfer, alter ego, and conspiracy to defraud the creditors of THMI and THI, and given that the Wilkes Claimants seek in various proceedings to recover the property of THMI and THI on similar theories, the GTCR Entities, Jannotta, and Holdings seek a declaration that they are not liable to the Trustee or to the Wilkes Claimants on these theories.

19.    In addition, the GTCR Entities, Jannotta, and Holdings seek an injunction prohibiting the Wilkes Claimants from proceeding with parallel state actions to collect on judgments against THMI or THI.

## PARTIES

20.    The GTCR Entities are affiliated with the Chicago-based private equity firm, GTCR.

21.    Plaintiff GTCR Fund VI, L.P. ("GTCR Fund VI") is a Delaware limited partnership with its principal place of business in Illinois.  GTCR Fund VI is a private equity fund that invests in privately held companies across a variety of industries, and was the primary equity investor in THI and, later, in Holdings.

22.    Plaintiff GTCR VI Executive Fund, L.P. is a Delaware limited partnership with its principal place of business in Illinois.  Plaintiff GTCR Associates VI is a Delaware general

6

partnership with its principal place of business in Illinois.  Through GTCR Executive Fund and GTCR Associates VI, certain individuals invested in privately held companies alongside Fund VI, in amounts generally proportionate to, but always less than, GTCR Fund VI's investments.

23.     Plaintiff GTCR Partners VI, L.P. ("GTCR Partners VI") is a Delaware limited partnership with its principal place of business in Illinois.  GTCR Partners VI is the general partner of Fund VI and GTCR Executive Fund, and the managing general partner of GTCR Associates VI.

24.     Plaintiff GTCR Golder Rauner, L.L.C. ("GTCR Golder Rauner") is a Delaware limited liability company with its principal place of business in Illinois.  GTCR Golder Rauner is the general partner of GTCR Partners VI.

25.     Plaintiff Edgar D. Jannotta, Jr. is a citizen of Wyoming.  Jannotta is a former managing principal of GTCR Golder Rauner.  Jannotta served on the board of managers of Holdings, and on the boards of directors of THI and THMI.

26.     Plaintiff THI Holdings, LLC is a Delaware limited liability company which had its principal place of business in Maryland.  Since 2003, Holdings has been the sole shareholder of THI.

27.     THI is a Maryland-based company whose subsidiaries owned, operated, and managed nursing homes.  Between 2002 and March 2006, THI owned THMI, a management company with its principal place of business in Maryland.

28.     Defendant Beth Ann Scharrer is the Chapter 7 trustee of the Debtor, Fundamental Long Term Care, Inc., and is a Florida resident.

1521287.1

29.     The Personal Representatives of the Estate of Juanita Amelia Jackson ("Jackson Estate"), the Estate of Elvira Nunziata ("Nunziata Estate"), the Estate of Joseph Webb ("Webb Estate"), the Estate of Opal Lee Sasser ("Sasser Estate"), and the Estate of Arlene Anne Townsend ("Townsend Estate") are all citizens of Florida.

30.     The Personal Representative of the Estate of James Henry Jones ("Jones Estate") is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 541.

32.     This adversary is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

33.     Venue of this action in this district is proper pursuant to 28 U.S.C. § 1409.

34.     The statutory predicates for relief requested herein are Sections 541, 362(a)(1), 362(a)(3), and 105(a) of the Bankruptcy Code, Bankruptcy Rule 7065, and the All Writs Act, 28 U.S.C. § 1651.

## FACTUAL BACKGROUND

**A.**     **The GTCR Funds Invested in THI**

35.     In 1998, the GTCR Funds invested $1 million in THI, and GTCR Fund VI became THI's majority shareholder.  In 1999, the GTCR Funds made additional investments totaling more than $11 million.  In 2000, they invested more than $10 million.

36.     In 2001, the GTCR Funds invested $4 million into THI, and the GTCR Funds also loaned $4.5 million to a subsidiary of THI.

37.     In 2002, THMI was formed as a wholly owned subsidiary of THI, to provide management services to nursing-home operators.

1521287.1

38.     By the end of 2002, THI's subsidiaries operated or managed over 90 skilled nursing facilities, specialty hospitals, and outpatient rehabilitation centers in twelve states.

39.     In 2003, THI's shareholders exchanged their shares in THI for shares in Holdings, so that Holdings became the sole shareholder of THI.   GTCR Fund VI was the majority unitholder of Holdings.

40.     Exercising its rights as majority unitholder, GTCR Fund VI appointed certain members of Holdings' board of managers, including Jannotta.  At various times, Holdings' board of managers included GTCR-related personnel, THI officers, and/or others with healthcare industry experience.

41.     As the sole owner of THI's stock, Holdings had the right to select the members of THI's board of directors.  In turn, as THMI's parent, THI had the right to select the members of THMI's board of directors.

42.     Exercising these rights, Holdings and THI appointed Jannotta and others, including GTCR-related personnel, officers of THI, and others with healthcare industry experience, to THI's and THMI's boards of directors.

43.     The GTCR Funds and Jannotta did not manage the day-to-day operations of THI and THMI.

44.     THI and its subsidiaries, including THMI, had their own officers who were experienced in the health care industry and were responsible for the day-to-day operations of those businesses.  THI and THMI's management did not overlap with the management of the GTCR Entities.

1521287.1

45.     The GTCR Funds maintained separate corporate and accounting and financial records, had separate tax returns, and separate bank accounts from THI and THI's subsidiaries. When the GTCR Funds loaned funds to THI or THI's subsidiaries, it documented those loans.

46.     GTCR Partners VI did not manage THI or THMI's business operations, either. GTCR Partners VI's connection to THI and THMI was indirect, by virtue of being the general partner of the GTCR Funds.

47.     Nor did GTCR Golder Rauner manage THI or THMI's business operations. Under a Professional Services Agreement with THI, GTCR Golder Rauner agreed to provide THI with "financial and management consulting services."  Otherwise, GTCR Golder Rauner's connection to THI and THMI was indirect, as general partner of GTCR Partners.

**B.      THI Holdings**

48.     In 2002, Holdings was formed to purchase certain nursing home assets from Integrated Health Services, Inc. ("IHS"), a substantial nursing home chain that had filed for bankruptcy protection in 2000.  But, in January 2003, another entity, ABE Briarwood Corp. ("Briarwood"), outbid Holdings for those assets.

49.     Briarwood, however, did not operate the former IHS facilities.  Instead, Briarwood sought to lease those assets to an affiliate of THI that would operate the former IHS facilities.  To that end, Holdings formed THI of Baltimore, Inc. ("THI of Baltimore") on April 10, 2003.  On April 11, 2003, THI of Baltimore entered into an agreement with Briarwood, pursuant to which the subsidiaries of THI of Baltimore would lease and operate the former IHS nursing homes.

50.     Holdings was a holding company.  It did not manage THI or THMI's day-to-day operations, and did not own or operate any nursing home facilities.  Holdings held board of

10

managers meetings, prepared board consents and board minutes, filed its own tax returns, and maintained other corporate formalities, separate from THI and THMI.

## C.    THI's Financial Performance Declined

51.    THI's financial performance was initially promising.   In each of its first few years, consolidated financial statements for THI and its subsidiaries showed their consolidated net income was rising.   For 2002, THI and its subsidiaries reported consolidated net revenue of $185.6 million and consolidated net income of $5.5 million.

52.    In early 2004, however, THI restated its 2003 financial statements.   THI and its subsidiaries had reported positive net income of $9.4 million, which was restated as a net *loss* of $26.6 million.

53.    By July 2004, THI's senior secured lender, General Electric Capital Corporation ("GECC"), and its mezzanine lender, Ventas Realty, L.P., gave notice that THI and its subsidiaries were in default on their loans.   THI and its subsidiaries then entered into a series of forbearance agreements between August 2004 and March 2006, to avoid the lenders accelerating the loans or exercising other contractual remedies.

## D.    Sale of THI of Baltimore and THMI

54.    THI replaced its senior management, but its financial difficulties persisted.   In July 2005, THI projected a *net loss* of more than $17 million for the full year.

55.    THI of Baltimore's prospects also dimmed.   In late 2004, THI of Baltimore's landlord, Briarwood, asserted that THI of Baltimore had breached its lease agreement.   By early 2005, Briarwood threatened to declare defaults and terminate the lease agreement pursuant to which THI of Baltimore's subsidiaries operated the former IHS properties.   Because THI of

1521287.1

Baltimore's subsidiaries did not operate any other properties, Briarwood's termination of the lease agreement would have rendered THI of Baltimore essentially worthless.

56.     On June 1, 2005, an individual affiliated with Briarwood made a proposal for the purchase of THI of Baltimore in a transaction that would require the buyer to pay little or no cash up front.  Negotiations ensued and, by August 2005, the offer was increased to $8 million cash. In September 2005, the offer was again increased -- to $8 million cash and a $2 million note payable in two years.   Those negotiations concluded with Fundamental Long Term Care Holdings, LLC ("FLTCH") agreeing to pay $10.2 million in cash to acquire the stock of THI of Baltimore.

57.     Duff & Phelps, an investment banking and financial advisory firm, evaluated the transaction and, in March 2006, reported to Holdings' board of managers that the transaction was fair.

58.     Holdings' sale of THI of Baltimore stock to FLTCH closed on March 28, 2006.

59.     From that sale, Holdings received $10.2 million in cash and invested $8.7 million of these funds in THI, and used the remaining funds to pay professional fees, settle litigation, make certain tax payments on behalf of equity holders, and purchase a directors and officers insurance policy.  Holdings did not distribute the proceeds of the THI of Baltimore sale to the GTCR Entities or Jannotta.

60.     The sale of THI of Baltimore did not occur in isolation, but was part of a larger restructuring of THI's business.  The same day -- March 28, 2006 -- the Debtor, FLTCI, bought the stock of THMI from THI for $100,000.

61.     The subsidiaries of THI of Baltimore operated many more facilities than THI's subsidiaries operated.  Accordingly, the sale of THI of Baltimore meant that THMI, a cost

1521287.1

center, would lose a large majority of the facilities to which it provided management services, leaving THMI with substantial excess overhead.

62.    Neither the GTCR Entities nor Jannotta received any proceeds from THI's sale of THMI stock.

63.    As part of the same restructuring, the GTCR Funds invested $20 million in cash into THI through a newly formed holding company, Atlantic Health Holdings, LLC.  The GTCR Funds made this investment with the expectation that the restructuring would allow THI to reestablish itself and ultimately return to profitability.

64.    Also on March 28, 2006, the GTCR Funds contributed to Holdings promissory notes from loans that the GTCR Funds had made to THI, with amounts then due on the notes in excess of $10 million.  The GTCR Funds received no equity in exchange for this contribution. Holdings, in turn, contributed these notes to the capital of THI.

65.    At bottom, the GTCR Funds and Jannotta did not receive any proceeds from the 2006 sales of THMI and THI of Baltimore.  Nor did GTCR Partners VI or GTCR Golder Rauner receive any sale proceeds.  To the contrary, the GTCR Funds collectively invested more than $30 million into THI, through THI Holdings and Atlantic Health Holdings, LLC, and by forgiving debts owed by THI.

**E.    THI's Financial Performance Did Not Improve**

66.    Despite an infusion of nearly $9 million of cash from Holdings' sale of THI of Baltimore, $20 million of cash from the GTCR Funds, and the forgiveness of more than $10 million that THI owed the GTCR Funds, THI's business did not meaningfully turn around. By May 2007, THI lender GECC notified THI and its subsidiaries that they were again in default

under the loan agreement, and THI and its subsidiaries entered into a new forbearance agreement with the lender on June 1, 2007.

67.     In 2007, THI and its subsidiaries began to sell their assets.  In August 2007, THI's subsidiaries sold two Ohio facilities for approximately $5 million.  And, in February 2008, THI and its subsidiaries agreed to sell the remaining facilities to OHI Acquisition Co. 1, LLC ("Omega").

68.     Duff & Phelps again provided THI's board of directors a fairness opinion on the Omega transaction, stating that "the consideration to be received by the Transferors in the Proposed Transaction is fair, from a financial point of view to the Company [Holdings] and THI."

69.     The Omega sale transaction closed on April 18, 2008.  The GTCR Entities, Jannotta, and Holdings did not receive proceeds from these or any other sales of THI property.

**F.     THI Entered Receivership in Maryland State Court in 2009**

70.     The February 2008 sale agreement gave Omega and its affiliates the option to purchase a facility owned by a THI subsidiary located in Maryland (the "Northwest Facility"). In November 2008, Omega and its affiliates notified THI that they would not exercise their option to purchase the Northwest Facility.

71.     THI filed an emergency petition for the appointment of a receiver in Maryland state court on January 7, 2009.  The petition explained that THI and its subsidiaries believed the immediate appointment of a receiver was "necessary to sustain operations at the Northwest Facility . . . and therefore ensure continuing patient care" and would be "the most cost-effective method of preserving the value of the THI Entities' assets, including but not limited to the Northwest Facility, and maximizing the return to the THI Entities' creditors."

14

72.     On January 9, 2009, the Maryland court entered an order granting the receivership petition.  In its order, the court appointed a receiver to wind up THI and its subsidiaries' affairs and to dissolve their corporations and limited liability companies.  The order vested the THI Receiver with "full title to all the assets of the THI Entities," "full power to enforce obligations or liabilities in its favor," and "the power and authority to take any and all actions in lieu of, and as would otherwise be taken by, the officers and directors of the THI Entities without further court order."

**G.     The Wilkes Claimants Obtain Default Judgments Against THMI and THI**

73.     Beginning in 2004 and continuing through 2009, Wilkes & McHugh pursued lawsuits on behalf of the Wilkes Claimants alleging nursing-home negligence, personal injury, and/or wrongful death against numerous defendants, including the owners and licensed operators of facilities at issue and their corporate parents and executives.

74.     THI and its subsidiaries did not own and were not the licensed operators of those facilities.  THI's connection to the facilities was through its ownership of THMI, which contracted to provide management services at the facilities until 2004.

75.     Nevertheless, the Jackson, Jones, Sasser, Townsend, and Webb Estates sued THMI and THI; and the Nunziata Estate sued THMI.

76.     Initially, THI defended itself and its former subsidiary, THMI, in these lawsuits. But in or about April 2010, the THI Receiver stopped providing a defense for THI and THMI in the lawsuits in which it was permitted by the trial court to withdraw its representation (except for one in which the trial court denied a motion by THI and THMI's counsel to withdraw).  As a result, the Wilkes Claimants ultimately obtained staggering, empty-chair judgments against THMI and, in most cases, also against THI.

1521287.1

77.     In these cases, the Wilkes Claimants apparently settled with the other defendants, including the owners and licensed operators of the nursing homes at issue.  For example, the Webb Estate settled with all defendants other than THI and THMI -- including the owner of the nursing home, the licensed operator, and the management companies that operated the nursing home during Joseph Webb's residency -- for $575,000 in September 2009.  The Nunziata Estate likewise settled with the licensed operator of the nursing home for $1.5 million in September 2006.

78.     In empty-chair jury trials on damages, the Jackson, Nunziata, and Webb Estates obtained judgments against THI and/or THMI totaling $110 million, $200 million, and $900 million, respectively.

79.     After obtaining a default on liability, the Townsend Estate obtained a $1.1 billion judgment against THI.

80.     Thus, four of the Wilkes Claimants, after obtaining defaults, have obtained judgments against THI and/or THMI totaling over $2.3 billion.  None of the Wilkes Claimants' liability claims against THI or THMI has ever been tested on the merits in a contested proceeding.

## H.     The Wilkes Claimants Attempt To Collect From the GTCR Entities, Jannotta, Holdings, and Other Targets

81.     Because THMI was defunct and the Wilkes Claimants (other than the Jones Estate) had not filed proofs of claim in the THI receivership court, the Wilkes Claimants' goal in obtaining empty-chair judgments against THMI and THI was to try to enforce those judgments against individuals and entities that were not parties to the underlying state-court lawsuits.

82.     The Wilkes Claimants have followed four routes in attempting to collect against their real targets: (1) initiating proceedings supplementary pursuant to Fla. Stat. § 56.29

("Section 56.29 proceedings supplementary") in Florida state court, (2) attempting to buy from THI any potential claims it might have had against any Wilkes targets, (3) pursuing civil rights and conspiracy lawsuits in federal district court, and (4) simply amending a post-trial judgment in Florida state court to add the Wilkes litigation targets.

      1)      <u>**Section 56.29 Proceedings Supplementary in Florida State Court**</u>

83.      In May 2011, the Jackson Estate commenced Section 56.29 proceedings supplementary against a total of sixteen impleaded defendants, including GTCR Fund VI, GTCR Partners VI, GTCR Golder Rauner, and Jannotta, to collect its $110 million judgment against THI and THMI. In that lawsuit, the Jackson Estate contends that the impleaded defendants are liable for those judgments based on theories that the impleaded defendants fraudulently transferred THI and THMI's property, conspired to defraud the creditors of THI and THMI, and are alter egos of THI and THMI. The Jackson Estate's Section 56.29 proceedings supplementary remain pending.

84.      In August 2012, the Nunziata Estate commenced Section 56.29 proceedings supplementary against one target, Rubin Schron, in an effort to collect its $200 million judgment against THMI. Like the Jackson Estate, the Nunziata Estate attempted to advance theories of fraudulent transfer and conspiracy by Schron and the other "sixteen joint venturers" -- including the GTCR Entities, Jannotta, and Holdings -- to defraud creditors of THMI and THI. That collection proceeding remains pending.

85.      One day after the Nunziata Estate filed its motion to implead Schron, the Webb Estate commenced Section 56.29 proceedings supplementary against Schron, in an effort to collect on its $900 million judgment against THMI and THI. The Webb Estate's motion

replicates the Nunziata Estate's motion to implead Schron. The Webb Estate's Section 56.29 proceedings supplementary remain pending.

### 2) The Wilkes Claimants' Failed Attempt to Buy THI's Claims

86.    In December 2011, the Wilkes Claimants approached the THI Receiver and offered $50,000 in exchange for legal claims belonging to THI that the Wilkes Claimants could then assert against the same targets that the Jackson Estate was suing in the Florida impleader lawsuits. In addition, the Wilkes Claimants offered to exchange mutual releases with the THI Receiver. Following a hearing, the Maryland court overseeing the THI receivership rejected that proposed settlement.

87.    The THI Receiver negotiated with certain targets of Wilkes' state-court lawsuits for an alternative settlement under which the THI Receiver and THI would exchange mutual releases with the settling Wilkes Claimants' targets; THI would assign certain claims to the settling Wilkes Claimants' targets; some of the settling Wilkes Claimants' targets (not the GTCR Entities, Jannotta, or Holdings) would make a $700,000 cash payment to the THI Receiver; and certain other settling parties (again, not the GTCR Entities, Jannotta, or Holdings) would pay for the THI Receiver and THI's defense in Wilkes-related lawsuits (the "Settlement Agreement").

88.    The Wilkes Claimants received notice of the THI Receiver's proposed settlement with the Wilkes targets, and one of the Wilkes Claimants filed an objection to it. On January 26, 2012, the Maryland receivership court held an evidentiary hearing on the THI Receiver's motion for approval of the Settlement Agreement and the opposition filed by the Wilkes Claimant. The Wilkes & McHugh firm participated in that hearing.

89.    After hearing testimony from the THI Receiver, the receivership court found that the THI Receiver had "to the best of his ability" weighed the value of the Settlement Agreement

to the THI estate, including the "likelihood or the unlikelihood of the success of certain claims" that might be brought against THI. The receivership court also found that the THI Receiver had acted "in the best interests" of THI in entering the Settlement Agreement. The receivership court then approved the Settlement Agreement over the Wilkes Claimant's objection. The Wilkes Claimants did not appeal the receivership court's order approving the Settlement Agreement.

### 3)   Civil Rights Actions in Federal District Court

90.     On April 26, 2013, while its Section 56.29 collection proceeding remained pending in state court, the Jackson Estate filed a complaint in the U.S. District Court for the Middle District of Florida against nine parties, including GTCR Fund VI, GTCR Partners VI, GTCR Golder Rauner, and many of the other entities that the Jackson Estate had impleaded in its state-court Section 56.29 proceedings supplementary.

91.     In this federal lawsuit, the Jackson Estate purported to assert a civil-rights claim under Section 1983 and a claim for civil conspiracy. The conspiracy claim is predicated on the same theories of fraudulent transfer of THI and THMI property and of conspiracy to defraud THI and THMI's creditors that the Jackson Estate had asserted in state court. The federal lawsuit also makes allegations that "THI and THMI were the mere instruments and alter egos of GTCR."

92.     The Jackson Estate seeks to recover the same damages as in its state-court collection proceeding:  payment on the $110 million judgment against THI and THMI. The case remains pending.

93.     The Webb Estate asserted nearly identical claims against the same defendants, in the U.S. District Court for the Middle District of Florida. In that case, the THI Receiver (Alan Grochal) filed a complaint seeking a declaratory judgment against the Jackson, Townsend, and Webb Estates. On July 8, 2013, the Webb Estate filed a counterclaim against Grochal and eight

1521287.1

others, including GTCR Fund VI, GTCR Partners VI, and GTCR Golder Rauner. There, the Webb Estate makes the same assertions about purported Section 1983 violations and conspiracies to commit fraudulent transfers of THI and THMI property and to defraud creditors of THI and THMI. The Webb Estate's federal complaint also makes the same allegations that "THI and THMI were the mere instruments and alter egos of GTCR." And the Webb Estate likewise seeks payment on the $900 million judgment it obtained against THI and THMI in state court. That lawsuit remains pending.

**4)      Amended Judgment in Florida State Court**

94.     The Townsend Estate took a more direct approach to the Wilkes Claimants' ultimate objective. Two days after the trial court entered the $1.1 billion judgment against THI, the Townsend Estate moved to amend that judgment, requesting that the trial court add as defendants to the judgment fifteen non-parties, including the GTCR Entities and Jannotta, on the purported grounds that they were "real parties in interest" of THI. These non-parties never received notice of any claims against them in the lawsuit and had no opportunity to defend themselves.

95.     The Townsend Estate also asked to add to the judgment Holdings, a defendant in the same lawsuit that the trial court had severed from the trial against THI. Holdings therefore had no opportunity to participate in the trial that resulted in the $1.1 billion verdict against THI.

96.     The same day that the Townsend Estate submitted its motion to amend the judgment, the trial court granted the motion and entered the amended judgment, adding all fifteen non-parties and Holdings to the $1.1 billion judgment. The entities and individuals who were added to the judgment promptly filed writs of prohibition, and by August 9, 2013, the Second District Court of Appeal had stayed all proceedings in the trial court. Writs of

1521287.1

prohibition and direct appeals of the amended judgment remain pending in the Florida appellate court.

     **5)**     <u>**The Wilkes Claimants Initiated an Adversary Proceeding in This Court.**</u>

97.     On October 1, 2013, the Wilkes Claimants jointly filed a complaint for declaratory relief in this Court.

98.     In their complaint, the Wilkes Claimants make the same allegations they have made in their other proceedings to collect on their judgments against THI and THMI: that the Wilkes Claimants' litigation targets -- including the GTCR Entities, Jannotta, and Holdings -- participated in making transfers of THMI and THI property, and conspired to defraud creditors of THMI and THI. (*See., e.g.*, Wilkes Compl. ¶¶ 87, 160, 162, 196, 223-26, 238, 279, 329, 340, 343, 357-59, 368, 385-86, 391, 434, 509-11, 514.) In addition, the declaratory judgment complaint repeats the Wilkes Claimants' conclusory and baseless refrain that "GTCR exercised such complete control over the THI enterprise that they are the mere alter egos of each other. The THI enterprise became the mere instruments of GTCR." (*Id.* ¶ 84; *see also, e.g.*, *id.* ¶¶ 78-83, 85-90, 106, 200, 209, 212, 520-62.)

99.     In short, the October 1, 2013 declaratory judgment complaint pieces together allegations that the Wilkes Claimants have been making against the same defendants in other forums.

**COUNT I -- DECLARATORY JUDGMENT REGARDING**
**THE WILKES CLAIMANTS' FRAUDULENT TRANSFER AND**
<u>**CONSPIRACY TO COMMIT FRAUDULENT TRANSFER THEORIES**</u>

100.     The GTCR Entities, Jannotta, and Holdings repeat and reallege the allegations contained in paragraphs 1 through 99 as though fully set forth herein.

101.     The GTCR Entities, Jannotta, and Holdings seek a declaratory judgment that:

21

(1)    they are not liable for fraudulent transfers of property belonging to THMI or THI, as the Wilkes Claimants have asserted in their state and federal lawsuits and adversary proceeding against the GTCR Entities, Jannotta, and/or Holdings; and

(2)    they are not liable on a theory of conspiracy to cause fraudulent transfers of THMI or THI's property, or otherwise to delay, hinder, or defraud the Wilkes Claimants, as the Wilkes Claimants have asserted in state and federal lawsuits and in their October 1, 2013 declaratory judgment complaint against the GTCR Entities, Jannotta, and/or Holdings.

102.    The declaration requested deals with a present, ascertained, or ascertainable state of facts, or a present controversy as to a state of facts, and is not sought merely as an advisory opinion or propounded from curiosity.

103.    There exists a real, actual, and justiciable controversy between the parties that warrants the seeking of a declaratory judgment.

104.    The GTCR Entities, Jannotta, and Holdings did not receive any transfers from THMI or THI for less than reasonably equivalent value.

105.    The GTCR Entities, Jannotta, and Holdings have not taken any action with the actual intent to hinder, delay, or defraud any creditor of THMI or THI.

106.    The GTCR Entities, Jannotta, and Holdings further did not enter into an agreement with any person or entity to commit or engage in fraudulent transfers of THMI or THI property.

**COUNT II -- DECLARATORY JUDGMENT REGARDING
THE WILKES CLAIMANTS' ALTER EGO THEORIES**

107.    The GTCR Entities, Jannotta, and Holdings repeat and reallege the allegations contained in paragraphs 1 through 99 as though fully set forth herein.

108.    The GTCR Entities, Jannotta, and Holdings seek a declaratory judgment that they are not liable for the debts or obligations of THMI or THI on an alter ego theory.

22

109.    The declaration requested deals with a present, ascertained, or ascertainable state of facts, or a present controversy as to a state of facts, and is not sought merely as an advisory opinion or propounded from curiosity.

110.    There exists a real, actual, and justiciable controversy between the parties that warrants the seeking of a declaratory judgment.

111.    The GTCR Entities, Jannotta, and Holdings maintained a legal and economic existence separate from THMI and THI.

112.    The GTCR Entities, Jannotta, and Holdings did not manage the day-to-day operations of THMI or THI.

113.    To the extent, if any, that the GTCR Entities, Jannotta, and Holdings were involved in organizing THMI or THI, they did not form those entities for a fraudulent purpose.

114.    The GTCR Entities, Jannotta, and Holdings did not use the corporate form of THI or THMI for an improper and fraudulent purpose.

115.    The GTCR Entities, Jannotta, and Holdings did not own, operate, or manage, directly or indirectly, Debtor FLTCI before or after the sale of THMI.

**COUNT III -- INJUNCTIVE RELIEF PURSUANT TO 11 U.S.C. § 105**

116.    The GTCR Entities, Jannotta, and Holdings repeat and reallege the allegations contained in paragraphs 1 through 99 as though fully set forth herein.

117.    Section 105 of the Bankruptcy Code generally grants bankruptcy courts broad powers with respect to the administration of bankruptcy cases.  In particular, Section 105(a) authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

118.    The Wilkes Claimants have acknowledged in their collection proceedings, including in their declaratory judgment action filed in this Court on October 1, 2013, that the

1521287.1

assets they are seeking to recover -- under fraudulent transfer, conspiracy to defraud, and/or alter ego theories -- are assets belonging to THMI and THI.

119.    The claims pursued by the Wilkes Claimants in other courts are substantially the same, if not identical to the claims belonging to the Debtor's estate.  Accordingly the Wilkes Claimants' lawsuits in other courts unnecessarily interfere with the Trustee's administration of the Debtor's estate.

120.    By preventing claims related to the property of THMI from being litigated outside of this bankruptcy proceeding, the requested injunction will further the orderly liquidation of the Debtor.

121.    The GTCR Entities, Jannotta, Holdings, and the Debtor's bankruptcy estate will suffer irreparable harm absent an injunction because of the risk of inconsistent determinations if the Wilkes Claimants are allowed to litigate the same claims in multiple courts.

122.    The Wilkes Claimants themselves have filed their own declaratory judgment action to bring before this Court their alter ego claims, and their related assertions of fraudulent transfer and conspiracy to defraud.

123.    The likelihood of irreparable harm to the Debtor's bankruptcy estate, the GTCR Entities, Jannotta, and Holdings here in the absence of injunctive relief far outweighs any harm to the Wilkes Claimants.

124.    The public interest is served by an injunction because an injunction will conserve judicial resources by allowing the Wilkes Claimants' claims to be heard in a single proceeding, rather than in multiple proceedings in state and federal courts.

125.    For these reasons, an injunction is necessary and appropriate, to allow the Court to enforce its exclusive jurisdiction under 28 U.S.C. § 1334 and 11 U.S.C. § 541.

126.    This Court should apply Section 105 to enjoin and to prohibit the Wilkes Claimants from pursuing collection proceedings against the GTCR Entities, Jannotta, or Holdings to recover the property of THMI or THI, including the Section 56.29 post-judgment collection proceedings that the Jackson, Nunziata, and Webb Estates are currently pursuing in Florida state court.

## COUNT IV -- INJUNCTIVE RELIEF PURSUANT TO 11 U.S.C. § 362

127.    The GTCR Entities, Jannotta, and Holdings repeat and reallege the allegations contained in paragraphs 1 through 99 as though fully set forth herein.

128.    Upon the filing of a bankruptcy petition, Section 362(a) of the Bankruptcy Code operates as an automatic stay of, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

129.    The Wilkes Claimants have acknowledged in their collection proceedings and in their declaratory judgment action filed in this Court on October 1, 2013, that the assets they are seeking to recover -- under fraudulent transfer, conspiracy to defraud, and/or alter ego theories -- are assets belonging to THMI and THI.

130.    Because the claims pursued by the Wilkes Claimants in other courts are substantially the same, if not identical, to the claims belonging to the Debtor's estate, those actions unnecessarily interfere with the Trustee's administration of the Debtor's estate.

131.    By preventing claims related to the property of THMI from being litigated outside of this bankruptcy proceeding, the requested injunction will further the orderly liquidation of the Debtor.

1521287.1

132.    The GTCR Entities, Jannotta, and Holdings will suffer irreparable harm absent an injunction because of the risk of inconsistent determinations if the Wilkes Claimants are allowed to litigate identical claims in multiple courts.

133.    The Wilkes Claimants have filed their own declaratory judgment action to bring their fraudulent transfer and alter ego allegations before this Court.

134.    The likelihood of irreparable harm to the Debtor's bankruptcy estate, the GTCR Entities, Jannotta, and Holdings here in the absence of injunctive relief far outweighs any harm to the Wilkes Claimants.

135.    The public interest would be served by an injunction because an injunction would conserve judicial resources by allowing the Wilkes Claimants' claims to be heard in a single proceeding, rather than in multiple proceedings in state and federal courts.

136.    For these reasons, an injunction is necessary to allow the Court to enforce the automatic stay under 11 U.S.C. § 362.

137.    This Court should apply Section 362 to enjoin and prohibit Defendants from further pursuing proceedings against the GTCR Entities, Jannotta, and Holdings to recover the property of THMI or THI, including the Section 56.29 post-judgment collection proceedings that the Jackson, Nunziata, and Webb Estates are currently pursuing in Florida state court.

## PRAYER FOR RELIEF

**WHEREFORE**, the GTCR Entities, Jannotta, and Holdings respectfully request as follows:

(1)    a declaratory judgment against the Wilkes Claimants and the Trustee that (i) they are not liable for fraudulent transfers of property belonging to THMI or THI, as the Wilkes Claimants have asserted in their state and federal lawsuits and adversary proceeding against the GTCR Entities, Jannotta, and/or Holdings; and (ii) they are not liable on a theory of conspiracy to cause fraudulent transfers of THMI or THI's property, or otherwise to delay, hinder, or defraud the Wilkes Claimants, as the Wilkes Claimants have asserted in state and federal lawsuits and in their October

26

1, 2013 declaratory judgment complaint against the GTCR Entities, Jannotta, and/or Holdings;

(2)    a declaratory judgment against the Wilkes Claimants and the Trustee that they are not liable for the debts or obligations of THMI or THI on an alter ego theory;

(3)    an injunction, pursuant to 11 U.S.C. § 105, enjoining and prohibiting the Wilkes Claimants and the Trustee from pursuing state-court proceedings against the GTCR Entities, Jannotta, or Holdings to recover the property of THMI or THI, including the Section 56.29 post-judgment collection proceedings that the Jackson, Nunziata, and Webb Estates are currently pursuing in Florida state court;

(4)    an injunction, pursuant to 11 U.S.C. § 362, enjoining and prohibiting the Wilkes Claimants and the Trustee from pursuing state-court proceedings against the GTCR Entities, Jannotta, and Holdings to recover the property of THMI or THI, including the Section 56.29 post-judgment collection proceedings that the Jackson, Nunziata, and Webb Estates are currently pursuing in Florida state court; and

(5)    such other and further relief as is just and proper.

1521287.1

Dated:  October 7, 2013

Respectfully submitted,

BUSH ROSS, P.A.
1801 N. Highland Avenue
P.O. Box 3919 (33601-3913)
Tampa, FL 33602
(813) 224-9255 (telephone)
(813) 224-9620 (facsimile)

and

KIRKLAND & ELLIS LLP
James Stempel
jstempel@kirkland.com
Gabor Balassa
gbalassa@kirkland.com
Matthew Nirider
mnirider@kirkland.com
300 North LaSalle St.
Chicago, IL 60654
(312) 862-2000 (telephone)
(312) 862- 2200 (facsimile)

By: /s/ Jeffrey W. Warren
    Jeffrey W. Warren, Esq.
    Florida Bar No. 150042
    jwarren@bushross.com

1521287.1